IN RE the MARRIAGE OF:

James T. FRITZ, Petitioner-Appellant,

v.

Mary D. FRITZ, Respondent-Respondent.

Court of Appeals

*No. 98–0605. Submitted on briefs September 14, 1999.—Decided October 6, 1999.*

(Also reported in 605 N.W.2d 270.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of A. *Steven Porter* of *Porter, Jablonski & Associates, S.C.* of Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Christy A. Brooks* of *von Briesen, Purtell & Roper, S.C.* of. Milwaukee.

Before Nettesheim, Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. James T. Fritz appeals from an order denying his § 806.07, STATS., motion to reopen the circuit court's order determining the amount of family support he is required to pay as a result of his divorce from Mary D. Fritz. James contends that the court erred by deciding the family support amount based on an improper salary stipulation. The salary stipulation was not proper, he argues, because he was not questioned by the court as to whether he voluntarily consented to the stipulation. We cannot agree with James's contention. To the contrary, we determine that James conceded a fact—his earning capacity—in the litigation, both parties did not agree to this fact, and the earning capacity concession

was not a legally-binding stipulation. Accordingly, we affirm.

¶ 2. After twenty years of marriage, James and Mary were divorced on March 26, 1996. They had entered into a Marital Settlement Agreement that maintained joint custody of their children, with Mary having primary placement of the children. The monthly amount that James would pay for child support and maintenance was deferred to a later hearing date because James resigned from his job shortly before the divorce hearing.

¶ 3. James had resigned from his job as a salesperson for Kronos Company, where he made $200,000 annually. He then began another sales position with Computer Associates where he earned a $45,000 base salary. Mary accused James of trying to evade his financial obligations by quitting his high-paying job and accepting a much lower salary right before the court was to determine how much he could afford to pay in family support. In fact, Mary maintained that James had threatened her that "rather than hav[ing] to pay the kind of maintenance and child support that was being discussed he would quit his job."

¶ 4. James had a different take on the reason he quit his Kronos position. He testified that his decision to leave was not voluntary because he was sexually harassed by his boss. He alleges his boss "would grab [his] chest and twist [his] nipple," while asking about his romantic relationship with his coworker. He asserts he was the boss's "whipping boy" and "constantly harass[ed]." "As hard as I had worked there, I was referred to as the playboy who made so much money and drove nice cars and didn't work enough time and didn't put enough hours in. . . . [T]hey were

terminating my position. The major accounts position was being let go."

¶ 5. The issue of why James quit his job was important to the parties. If the court determined that James's decision to leave his job was reasonable, the family support would be based on his actual earnings rather than on his earning capacity. At the close of the day's testimony, the court issued a temporary order requiring James to pay $937.50 a month in child support and $1000 a month in maintenance. A hearing to complete the matter was scheduled for a few months later.

¶ 6. At the subsequent hearing, James's counsel requested a recess to meet with the judge in chambers. During the meeting, the judge remarked that he did not find James to be a credible witness and he thought James would have gotten that message from the temporary order he issued.[1] After the meeting, James's counsel related the judge's remarks to his client.

> After th[e meeting with the judge,] I went out in the hall and I said to Jim, . . . the judge has indicated that he doesn't find . . . you to be a credible witness. . . . [James] said, I might as well pay them ten thousand, a hundred thousand dollars a month, because there's no way we're going to win this now. And he just kind of flew off the handle and lost it.
>
> And you know, I tried to settle him down. . . . I said, look, it doesn't appear good. We've got our choice of going back through and putting on our testimony or trying to cut some type of deal. And Jim, again, being upset, he was like, well, I'm not paying you for another day of trial here when we're

---

[1] Neither of the parties challenges the propriety of the conference in the judge's chambers; therefore, we will not address the court's tactics employed to encourage settlements.

screwed anyway. You know, let's just settle this thing, get rid of it, give them whatever they want. . . . And I said to him, look, would you have a problem stipulating to an earning capacity of a hundred thousand dollars a year as your earning capacity. I said, you could . . . get[ ] stuck with an order based upon close to $200,000 a year. I would recommend damage control to stipulate to a hundred thousand dollars a year. . . . And Jim, again, you know, basically was, as I said, going to agree to anything at that point because he was so upset.

James's counsel returned to the courtroom and informed the court:

Judge, I have talked to my client regarding the various discussions that we have had in chambers. . . . Mr. Fritz, while not overjoyed at the process, would agree to stipulate for the purposes of the entry of an order by the court that—that he has an earning capability of a hundred thousand dollars per year.

We are requesting that the—the court would hear some brief oral arguments from both attorneys on the issue of . . . child support or maintenance or family support.

The judge questioned Mary's counsel if the suggested procedure was acceptable to her, and she consented. The court added: "I think it would have been better if we could have had a complete stipulation, but this is much better than a full hearing and it's acceptable to the court."

¶ 7. The court then entertained oral arguments from both parties about the family support issue. James's counsel presented a family support proposal to the court based on a $100,000 earning capacity, while Mary's counsel argued that a higher earning capacity

should be considered. Mary's view was that family support should be based on a salary between $184,000—James's income at Kronos—and $190,000—James's sales quota at his new job.

¶ 8. The court then found that James's minimum earning capacity was $100,000 per year and set family support at $4166.67 per month for ten years. The following day, James quit his Computer Associates job. He later filed a motion to reopen the court's family support order.

¶ 9. Meanwhile, James did not obey the court order to pay family support. After six months passed, Mary, having received only $1596 in family support during that period, moved the court to find James in contempt. The court held a hearing on both James's motion to reopen and Mary's contempt motion.

¶ 10. In support of his motion to reopen the family support order, James contended that he was under "undue and excessive pressure to settle" his case, which resulted in his involuntary agreement to the $100,000 earning capacity. James additionally argued that this agreement should not have been relied on by the court because the court did not examine him on the record about whether he thought the stipulation was fair, if he understood it and if he was voluntarily entering into it.

¶ 11. At the motion hearing, James was represented by new counsel. James's prior counsel testified about his conversations with the judge that indicated that the judge did not find James to be a credible witness. Additionally, he explained his conversations with his client, where he suggested they perform damage control by stipulating to a $100,000 earning capacity. James testified that if he had been asked on the record

at the hearing whether he had voluntarily agreed to such a stipulation he would have said no.

¶ 12.　The court concluded that James's attorney's statements on the record satisfied the § 807.05, STATS., requirements for a stipulation. The court also found that James's judgment was not impaired when he agreed to the stipulation with his attorney. James was found in contempt for failing to pay according to the family support order. In addition, his motion to reopen was denied. James appeals.

¶ 13.　James filed his motion to reopen the order under § 806.07, STATS. Section 806.07 allows a court to relieve a party from an order based on mistake, inadvertence, surprise or excusable neglect. *See* § 806.07(1)(a). We will not reverse a circuit court's denial of relief under § 806.07 unless that court erroneously exercised its discretion. *See Nehls v. Nehls*, 151 Wis. 2d 516, 518, 444 N.W.2d 460, 460 (Ct. App. 1989). A proper exercise of discretion occurs when the court's determination is reasonably based on facts in the record and founded on proper legal standards. *See id.* at 518, 444 N.W.2d at 460–61.

¶ 14.　On appeal, James contends that the circuit court erroneously exercised its discretion in denying his motion to reopen the family support order because it did not apply the proper legal standard. He maintains that the order was based upon an invalid earning capacity stipulation. In particular, he argues that the earning capacity stipulation was invalid because when it was made the court failed to question the parties on the record if they understood the stipulation's effects and if they were voluntarily consenting to it.

¶ 15.　We cannot accept James's characterization of the remarks made at the hearing as a stipulation.

The term "stipulation" is generously used in court-rooms today, but it has a precise legal definition found in § 807.05, STATS.

> **Stipulations.** No agreement, stipulation, or consent between the parties or their attorneys, in respect to the proceedings in an action or special proceeding shall be binding unless made in court . . . and entered in the minutes or recorded by the reporter, or made in writing and subscribed by the party to be bound thereby or the party's attorney.

¶ 16. This case presents a situation similar to that in *Paine v. Chicago & North Western Railway Co.*, 217 Wis. 601, 258 N.W. 846 (1935). In that case, the situation was as follows. While driving home from a card party, Nellie and Charles Paine were killed when a train hit their car. *See id.* at 602, 258 N.W. at 847. Their heirs brought negligence suits against the railway. At trial, a critical issue arose about who was driving the car. During the trial, the attorneys had the following dialogue on the record:

> Mr. Rausch: To shorten the trial—to eliminate the necessity of offering proof on certain points, Mr. Baker and I have agreed to stipulate that if we are entitled to recover for damage to the automobile that that should be allowed at $250.00; *that it belonged to Charles L. Paine.*
> Mr. Baker: I don't know about the ownership of it.

*Id.* at 603, 258 N.W. at 847. The circuit court treated this dialogue as a stipulation and the fact that Charles was driving the car was admitted into evidence. *See id.* Concluding that the dialogue was not a legal stipulation, the supreme court disagreed.

¶ 17. When considering this dialogue on appeal, the supreme court noted that there are two types of agreements frequently made by attorneys at trial. One type is a stipulation "which ha[s] all the essential characteristics of a mutual contract." *Id.* at 604, 258 N.W. at 848.

¶ 18. The second type of agreement attorneys frequently make at trial is a concession of fact. This is really a procedural convenience that simply relieves the party from the inconvenience of proving that fact. *See id.* at 604–05, 258 N.W. at 848. "Such admissions are frequently made for the purpose of saving time." *Id.* at 604, 258 N.W. at 848 (quoted source omitted). "It is, of course, entirely proper for parties to avoid litigation costs by stipulating to uncontested facts—or by agreeing not to contest some facts they might dispute." *Sipl v. Sentry Indem. Co.*, 146 Wis. 2d 459, 467–68, 431 N.W.2d 685, 688 (Ct. App. 1988). However, to formally constitute a stipulation, the statement must be conclusive on that question, at least for the purposes of the litigation. *See id.* at 468, 431 N.W.2d at 688.

¶ 19. The above precisely describes the statements involved here. What James calls a "stipulation" was really a statement made for the purpose of damage control and to try to prevent the court from considering James's maximum earning capacity as $200,000 per year. James conceded a fact to the fact finder. Instead of continuing with arguments that his actual earnings of $45,000 should be the basis for the family support order, James made the strategic decision to concede to a higher earning capacity figure, $100,000, hoping that the court would not use the $200,000 figure to determine family support. Making factual concessions is a common trial practice to expedite the fact-finding pro-

cess of the litigation. *See id*. at 467–68, 431 N.W.2d at 688.

¶ 20. Moreover, James's concession cannot be considered a stipulation because both parties did not agree to it. *See Bliwas v. Bliwas*, 47 Wis. 2d 635, 638, 178 N.W.2d 35, 37 (1970) ("A stipulation between the parties in a divorce action is an agreement between them—a recommendation jointly made by them to the court suggesting what the judgment, if granted, is to provide."). Here, after the concession was made on the record, Mary continued to argue for a support order based on an earning capacity in excess of $100,000. James's concession did not resolve the matter for the purposes of the litigation.

██

¶ 21. The statements made at the hearing do not constitute a § 807.05, Stats., stipulation. They reflect only James's attempt to mitigate his earning capacity figure. In fact, Mary continued to argue in favor of a higher earning capacity figure. These statements should instead be regarded as a concession of fact. We therefore conclude that the parties did not enter into a stipulation. Because the statements were not a stipulation, the court was not required to conduct a personal colloquy with the parties about it. We reject James's argument.

*By the Court.*—Order affirmed.